# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| Hanley Industries, Inc. ) | ASBCA No. 58198 |
| ) | |
| Under Contract Nos. N00104-03-C-K101 ) | |
| N00104-04-C-K053 ) | |
| N00104-04-C-K063 ) | |

APPEARANCE FOR THE APPELLANT:      Ryan K. Manger, Esq.
                                   Manger Law, LLC
                                   St. Louis, MO

APPEARANCES FOR THE GOVERNMENT:    Ronald J. Borro, Esq.
                                   Navy Chief Trial Attorney
                                   Tinelle S. Rose, Esq.
                                   Trial Attorney
                                   NAVSUP Weapons Systems Support
                                   Mechanicsburg, PA

## OPINION BY ADMINISTRATIVE JUDGE MELNICK ON GOVERNMENT'S MOTION TO DISMISS

Hanley Industries, Inc. (Hanley or appellant), appeals under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109, from a deemed denial by the contracting officer (CO) of a claim submitted 15 March 2010. Appellant seeks $480,130 in increased costs alleged to have been incurred as a result of a constructive change under three contracts.

The government moves to dismiss the appeal on the ground that the claim was submitted more than six years after the claim accrued and is, therefore, time barred under 41 U.S.C. § 7103(a)(4)(A). We deny the motion.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. This appeal concerns three firm-fixed-price contracts for the manufacture and delivery of MD66 CCU-44/B Impulse Cartridges and MD65 CCU-45/B Impulse Cartridges (impulse cartridges), gas cartridges that when activated issue a measured amount of gas which propels an object (compl. ¶¶ 6-9). The Department of the Navy, Naval Inventory Control Point – Mechanicsburg (Navy) awarded Hanley Contract No. N00104-03-C-K101 (K101) for MD66 CCU-44/B Impulse Cartridges, Contract No. N00104-04-C-K053 (K053) for MD66 CCU-44/B Impulse Cartridges, and Contract

No. N00104-04-C-K063 (K063) for MD65 CCU-45/B Impulse Cartridges (the contracts) (R4, tabs 6, 18, 23). K101 was awarded on 18 June 2003 (R4, tab 6).

2. Each of the contracts required the packaging for the impulse cartridges to adhere to defined Special Packaging Instructions (SPI) identified by the letters SPI or TPO, a number, and a set of printed instructions with drawings. K101 and K053 required the packaging for the impulse cartridges to be in accordance with SPI 01-063-3165, Level A, and K063 required packaging in accordance with TPO 01-063-3167, Level A. (R4, tab 6 at 263, 266-68, tab 18 at 443, 445-47, tab 23 at 517-20) The relevant packaging requirements for all three contracts are the same.

3. Two days after the award of K101, Mr. Ronald Jones, a marketing manager at Hanley, emailed CO Dana McMullen to clarify the packaging requirements for the impulse cartridges. His email stated:

> Our reading of the contract Section D Packaging calls for all cartridges to be packaged 10 per can in a 4G fiberboard box. The Can is specified as 4.975 diameter by 2.25 height. Please confirm and are the can dimensions inside dimensions?

(R4, tab 8) CO McMullen responded on 1 July 2003:

> All cartridges are to be packaged 10 per can in a 4G fiberboard box....
>
> Also, the 4.976 diameter by 2.25 height is the inside dimensions of the can.

(R4, tab 9)

4. Section H of each contract required Hanley to submit a program plan in order to describe the approach, resources and needs of the contractor to perform the contract (R4, tab 6 at 275, tab 18 at 455, tab 23 at 528). The program plans were to be submitted within 30 days of contract award pursuant to the Contract Data Requirements List Item A008 (R4, tab 6 at 295, tab 18 at 475, tab 23 at 547). Hanley submitted its initial program plan for K101 sometime prior to 12 September 2003 (R4, tab 10). The program plan proposed that the Lot Acceptance Test (LAT) samples would be "commercially packaged for shipment to the testing agency." This language appeared in a paragraph dealing exclusively with the LAT samples. In a separate paragraph, the program plan also stated:

> Under this contract 10 rounds of CCU-44/B Impulse Cartridges will be installed in tear strip metal cans and the lid

2

crimped and sealed to form an environmentally sealed
container. Cans go into a 4G fiberboard box for shipment.
The boxes will be marked and closed for palletization.

(Gov't mot., ex. A)

5. By letter dated 12 September 2003, CO M. Altice Davis rejected Hanley's initial program plan on the grounds that the proposed plan language stating that LAT samples could be commercially packaged was "incorrect." CO Davis's letter also stated, in relevant part, that "Section D, Packaging and Marking, of your contract shows that all units (including First Article Test and LAT) shall be packaged in accordance with SPI 01-063-3165, Level A." (R4, tab 11)

6. Hanley's revised program plan, dated 29 September 2003, stated, "All samples and production units will be packaged in accordance with SPI 01-063-3165, Level A." The revised plan still included the paragraph from the original program plan:

Under this contract 10 rounds of CCU-44/B Impulse
Cartridges will be installed in tear strip metal cans and the lid
crimped and sealed to form an environmentally sealed
container. Cans go into a 4G fiberboard box for shipment.
The boxes will be marked and closed for palletization.

(R4, tab 13 at 327) Hanley's revised program plan was approved by CO M.E. Wise by letter dated 8 October 2003 (R4, tab 14).

7. As a first-time manufacturer of this class of impulse cartridges, Hanley was required to submit 94 First Article Test (FAT) samples by 17 September 2003 for K101 (compl. ¶ 19; R4, tab 6 at 258). After receiving the 12 September 2003 letter from CO Davis, Hanley proceeded to ship the 94 FAT samples. According to the ammunition data card, these items were shipped "10 PER CAN/24 CANS PER 4G FIBERBOARD BOX." The government's inspector, Mr. Vernon Buscher, approved the shipment on 18 September 2003 by signing the accompanying data ammunition card. (R4, tab 12) There is no indication in the record that the government objected to appellant's packaging of the FAT samples. The FAT samples for K101 were approved by contract Modification No. P00002 on 16 December 2003 (R4, tab 17).

8. The solicitations for K053 and K063 were issued on 22 October 2003 and 18 November 2003, respectively (R4, tabs 15, 16). The government awarded K053 to Hanley on 22 January 2004 and K063 to Hanley on 16 March 2004 (R4, tabs 18, 23).

3

9. On 9 February 2004, Mr. Larry Harris, the on-site Quality Assurance Representative from DCMA, forwarded an email to CO McMullen, which he introduced by explaining:

> Marge Chamberlain is a packaging specialist located in our St. Louis office. She went with me, at my request, to Hanley to look at Hanley's concerns/questions about the packaging in these contracts.
>
> As you can see, she had as many questions as answers.

The email that was forwarded was sent by Ms. Chamberlain on 6 February 2004. In the email she lists several questions on the specifics of the packaging requirements, including the following:

> There is a Special Packaging Instruction 01-063-3165, showing ten units per a tear-strip can, cans are to be placed in a weather-resistant fiberboard box, 40 boxes palletized on a wood pallet....
>
> 1. How many cans should go into the fiberboard box? No quantity is listed.

(R4, tab 19 at 491)

10. On 18 February 2004, Hanley submitted its program plan for K053. The plan for the packaging was the same as that in the revised plan submitted for K101. (R4, tab 21 at 500) The plan was approved 9 March 2004 with one concern not germane to packaging (R4, tab 22).

11. By email dated 17 March 2004, CO McMullen responded to the questions raised in Ms. Chamberlain's February email, responding that "[o]ne can should go into one fiberboard box." Mr. Harris forwarded this email to Mr. Larry Weaver of Hanley the same day. (R4, tab 24)

12. Mr. Weaver responded by email the same day stating that he had received the message about the packaging. He asserted that the government was wrong in stating that the contract required one can in one fiberboard box, explaining "[t]hat would be simular [sic] to putting a marble in a cigar box. Those boxes are big and 1 can would be dwarfed inside the box." Mr. Weaver's response was forwarded to CO McMullen. She responded, "I double-checked with our engineers and they maintain that 1 can per 1 box is correct. Hanley should use dunnage to pack around the can." (R4, tab 25)

4

13. Mr. Jones sent a letter, dated 31 March 2004, to the government in reference to the contracts' SPI. The letter referenced K053 specifically as the subject matter contract; however, he noted that K101 and K063 were similarly affected. Mr. Jones asserted the instructions:

> [D]o not specify the quantity of inner packs to be place[d] in the outer packs. The size and indications under "Notice 2" therein indicates the size may vary by the quantity of the inner packs. Hanley estimated they could place 24 inner packs within the outer pack size indicated (10 3/8 x 10 3/8 x 16 3/4 inches)....
>
> [According to the 17 March 2004 email], the government specifies 1 can of 10 cartridges per inner pack (10 x 10 x 16 inches) and one inner pack per outer pack (10 3/8 x 10 3/8 x 16 3/4 inches)....
>
> ...The government can change the contract packaging but Hanley is entitled to the additional costs of $1.005 per unit.
>
> Please advise how the government wishes this change to be effected. The additional packaging will have to be ordered and provided to meet the delivery schedule....

(R4, tab 26)

14. By letter dated 8 April 2004, in response to Hanley's 31 March 2004 letter, CO McMullen denied that Hanley was entitled to additional costs. In her denial she disputed Hanley's interpretation of the contract. She closed the letter with notice that Hanley was similarly bound under K101 and K063 to comply with the packaging requirements as listed in Section D of each contract. (R4, tab 27)

15. By letter dated 19 April 2004, Hanley requested the government to allow Hanley to ship 24 to 28 cans per outer container. In the letter, Mr. Jones reiterated that Hanley did not interpret the SPI in the same manner as the government: "It seemed clear to us that more than one can (inner container) was to be packed into a box. That is how we read it, bid the solicitation and ordered the packaging for this contract. This is similar to the way [a contract for a different item] is packed." (R4, tab 28) The CO rejected both Hanley's interpretation and its request to ship in the manner proposed and restated the government's interpretation of the shipping requirements (R4, tab 33).

16. Hanley's program plan for K063 was approved on 29 April 2004 (R4, tab 32). The plan for the packaging was the same as that in the revised plan submitted for K101

5

and K053, even citing SPI 01-063-3165, Level A. The only difference in language was that the program plan noted that Hanley would be packaging "10 rounds of CCU-45/B Impulse Cartridges." (R4, tab 31 at 579)

17. Hanley continued to discuss the proper interpretation of the packaging requirements with the government, argued the wisdom of its own interpretation, and discussed other alternatives to the government's one can per box interpretation over the course of three months (R4, tabs 36-39, 54-56, 61-62, 64-74, 76-77).

18. By letter dated 21 December 2004, Hanley informed the government that it intended to submit a request and/or claim for equitable adjustment for each of the contracts "for all costs attributable to the packaging effort, they were directed to supply, along with all pertinent delay costs" (R4, tabs 98, 99, 100).

19. By letter dated 15 March 2010, Hanley submitted a certified claim to the contracting officer. The claim sought recovery "in the amount of $480,243.39 for its increased costs and delay costs...aris[ing] out of changes to the Contracts by the Department of the Navy." (R4, tab 105 at 709)

20. The record does not contain a final decision. By Notice of Appeal dated 26 June 2012, appellant filed this appeal of the deemed denial of its 15 March 2010 claim.

## DECISION

The government seeks dismissal for lack of jurisdiction over this appeal because appellant's claim is time barred under the CDA. The relevant provision of the CDA requires a contractor's claim against the government to be "submitted within 6 years after the accrual of the claim." 41 U.S.C. § 7103(a)(4)(A). Timely submission of a claim is a predicate to the Board's exercise of jurisdiction under the CDA. *Arctic Slope Native Ass'n v. Sebelius*, 583 F.3d 785, 793 (Fed. Cir. 2009); *The Boeing Co.*, ASBCA No. 57490, 12-1 BCA ¶ 34,916 at 171,676.

Appellant, as the proponent of this Board's jurisdiction, bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exchange Service*, 846 F.2d 746, 748 (Fed. Cir. 1988); *Raytheon Missile Systems*, ASBCA No. 58011, 13 BCA ¶ 35,241 at 173,015. However, disputed facts are subject to our fact-finding based upon a review of the record. *Raytheon Missile Systems*, 13 BCA ¶ 35,241 at 173,015 (citing *Inchcape Shipping Services*, ASBCA No. 57152 *et al.*, 10-2 BCA ¶ 34,578 at 170,475-76); *see also Cedars-Sinai Medical Center v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993).

6

There is no dispute that Hanley's letter to the contracting officer dated 15 March 2010 was appellant's properly certified claim (SOF ¶ 19). The issue before this Board is the date of claim accrual. Given the CDA's six-year limitation, to be timely Hanley's claim could not have accrued prior to 15 March 2004. A claim accrues "when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known." FAR 33.201 (JAN 2003).

To determine when the alleged liability was fixed, we begin by examining the legal basis of the particular claim. *Gray Personnel, Inc.*, ASBCA No. 54652, 06-2 BCA ¶ 33,378 at 165,475. Appellant's claim alleges that the government demand that only one can of impulse cartridges be placed in one fiberboard box constituted a constructive change to the contracts (SOF ¶ 19). To prove constructive change, appellant must prove: (1) the government compelled the contractor to perform work not required by the contract; (2) the government official directing the change had authority to alter the contractor's duties under the contract; (3) the contractor's duties were enlarged; and (4) the added work was not volunteered but resulted from the direction of an authorized government official. *E.g., Dan Rice Construction Co.*, ASBCA No. 52160, 04-1 BCA ¶ 32,595 at 161,262. The determination of whether a change occurred will require analysis of what the contract required and will potentially involve a question of whether the contract was ambiguous. For the purpose of establishing the date of claim accrual, the government's potential liability, for a constructive change, cannot be fixed *inter alia*, until the government enlarges the contractor's performance duties. *See Gray Personnel*, 06-2 BCA ¶ 33,378 at 165,476.

In this instance, the alleged constructive change stems from differing interpretations of the contracts' SPI. Appellant interpreted the packaging instruction to allow packing multiple cans into a single fiberboard box (SOF ¶ 13). The government's interpretation of the same SPI required that only one can be placed into one fiberboard box with dunnage used to fill empty space (SOF ¶ 12). For purposes of claim accrual, we need to determine when Hanley knew or should have known the CO's interpretation of the SPI differed from Hanley's own. Potential liability for enlarging appellant's performance could not be fixed until the CO told appellant that only one can could be placed in one box.

The government argues that it informed appellant of this requirement in emails as early as 1 July 2003 but no later than 12 September 2003 (gov't mot. at 6). Appellant argues that the claim accrued 17 March 2004 (app. resp. at 1).

The government's July 2003 (SOF ¶ 3) and September 2003 (SOF ¶ 5) emails were not sufficient to place appellant on notice of the CO's interpretation. The July email did not address whether multiple cans could be placed in each fiberboard box. In pertinent part, it merely repeated the wording of Hanley's prior email and understanding

7

of packaging requirements regarding the number of cartridges per can. The July email did not evince a different interpretation of the per can requirement much less express the government interpretation at the heart of this dispute regarding the cans per box requirement that appellant alleges enlarged its obligations under the SPI.

The September 2003 government email merely rejected appellant's initial plan to ship contract K101 LAT samples via "commercially accepted" means. The email made no mention of the cans per fiberboard box issue. Both appellant's prior program plan (SOF ¶ 4) and subsequent revised plan (SOF ¶ 6) expressed that multiple "cans" would be placed in each "box." Appellant's K101 FAT samples also were shipped "24 cans per 4G Fiberboard Box" (SOF ¶ 7) and accepted by the government. Moreover, Hanley's subsequent contract K053 program plan further repeated appellant's understanding that multiple cans were to be placed in each box.

The issue in dispute here did not surface until after award of contact K053 and K063 when the contracting officer affirmatively directed that "one can should go into each fiberboard box." Until that notice of the government's interpretation and the CO's direction was received by appellant on 17 March 2004, it did not have reason to know that a dispute had arisen. Therefore, Hanley's claim accrued no earlier than that date. Because Hanley's 15 March 2010 claim was within six years of its accrual, the appeal is not time-barred under the CDA.

In its motion filings, the government further asserts that any ambiguity in the SPI requirements was patent, imposing a prior duty of inquiry on appellant to clarify the SPI. Consequently, the government reasons that the claim accrued no later than "when appellant submitted its offers" (answer at 14). In this decision, we address only our jurisdiction over the appeal. We do not address the merits of the parties' contentions regarding contractual interpretive rules and risk allocation doctrines and duties.[1] In the context of deciding whether appellant's claim is time-barred under the CDA, we decide only that the claim in dispute could not have accrued prior to 17 March 2004 when the contractor first received direction from the contracting officer. *See* FAR 33.201. For liability to be fixed, some injury must have occurred. Hanley was not injured until after17 March 2004 since prior to the government's direction Hanley was shipping multiple cans per box (SOF ¶ 12).

---

[1] Nor do we address other potential government defenses, including final payment, and accord and satisfaction (answer at 14).

## CONCLUSION

Appellant's claim accrued no earlier than 17 March 2004. Accordingly, appellant's 15 March 2010 claim is timely, and the Board has jurisdiction to adjudicate appellant's appeal of the deemed denial of its timely-submitted claim. The government's motion to dismiss for lack of subject matter jurisdiction is denied.

Dated: 15 January 2014

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

ROBERT T. PEACOCK
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58198, Appeal of Hanley Industries, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

9